IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Plaintiff, | No. Mag. S-06-0330 EFB |
| | vs. | |
| ROBERT JAN SCOTFORD, | | <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u> |
| | Defendant. | |

**I.  INTRODUCTION**

This matter was before the court for a bench trial on January 29, 2007.  Defendant is charged in a nine count information with driving a snowmobile into an area closed to motorized access and refusing and resisting a Forest Service law enforcement officer's order to stop.  He is also charged with failing to comply with certain vehicle registration requirements.

Count one charges defendant with interference with an officer in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.3(a).  Count two charges defendant with failure to stop a vehicle when directed by an officer to do so in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.10(m).  Count three charges defendant with use of a vehicle off road in a manner that violates a Forest Service

////

////

1

order, in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.56.[1]  Count four charges defendant with operation of a motor vehicle off road in a manner that causes damage in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.15(h).  Count five charges defendant with failure to register an off road vehicle in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.15(I) and California Vehicle Code ("Cal. Veh. Code") § 38020.  Count six charges defendant with operation of an off road vehicle in a manner that violates government regulations pertaining to public lands in violation of 16 U.S.C. § 551, 36 C.F.R. § 261.15(I) and Cal. Veh. Code § 38301.  Count seven charges the defendant with failing to display a registration identification plate on an off road vehicle in violation of 16 U.S.C. § 551, 36 C.F.R. § 261.15(I) and Cal. Veh. Code § 38170(a).  Count eight charges defendant with failing to securely fasten an identification plate in a position to be clearly visible on an off road vehicle in violation of 16 U.S.C. § 551, 36 C.F.R. § 261.15(i) and Cal. Veh. Code § 38170(b).  Count nine charges defendant with failing to securely fasten identification plates on the left rear quadrant of an off road vehicle in violation of 16 U.S.C. § 551, 36 C.F.R.

§ 261.15(i) and Cal. Veh. Code § 38170(c).

All nine charges arise out of an attempt to stop a snowmobile, a subsequent chase of that snowmobile, and observations by the pursuing officer that a required registration sticker was not displayed.  It was undisputed at trial that a person operating a snowmobile went from Forest Service land that was open to snowmobile use onto private land and then, at two points, briefly traveled from private land onto Forest Service land closed to snowmobile use.  The testimony showed that this snowmobiler refused and resisted several commands by Forest Service law

---

[1] The information charges defendant with use of a vehicle off road in a manner that violates a Forest Service order, in violation of "36 C.F.R. § 261.56(m)."  Although section 261.56 does prohibit possession or use of "a vehicle off National Forest System roads," there is no subsection "m" to this regulation.  Incidentally, *both* parties in their post-trial briefing refer to section "261.56(m)."  In the case of obvious clerical errors such as this, such "surplusage" does not affect the information's validity.  35 Geo. L.J. Ann. Rev. Crim. Proc. 279 (2006) (citing, among other sources, *United States v. Elias*, 269 F.3d 1003, 1013 (9th Cir. 2001)).

enforcement Officer Thompson to stop. The key fact in dispute is whether the person operating that snowmobile was the defendant.

**II.     FACTS**

    **A.  The Pursuit**

On March 4, 2006, at approximately 5:00 p.m., Officer Thompson and a private citizen, Charlie Mulligan, who was riding with Officer Thompson on a separate snowmobile, encountered a snowmobiler at or near the National Forest boundary. The snowmobiler continued past them without stopping. Officer Thompson testified that he recognized both the snowmobile and the person driving it. Based on prior contacts with the defendant driving this same snowmobile, Officer Thompson testified that he was able to recognize the defendant and his vehicle. These prior contacts included issuing the defendant a prior citation in the same area, and on at least one occasion having a conversation with the defendant about this very snowmobile. The driver wore a full helmet and goggles, which when in place obscured the driver's face. However, Officer Thompson testified that he recognized the defendant's body size, his machine, and the defendant's short curls of "peppery" darkish hair coming out of the back of his helmet. Whether the officer could see enough of the driver to actually recognize him was an issue of some contention.

Officer Thompson followed the snowmobiler and, at some point, instructed him to stop. The driver failed to do so and a chase ensued. Officer Thompson gave several more orders to stop and the driver repeatedly failed to comply with those orders. While pursuing the snowmobiler, Officer Thompson was between twenty and thirty feet behind. He followed the snowmobiler through an opening in a fence and onto private land. The chase looped back around to where Officer Thompson first encountered the driver, through the fence opening and uphill to a private road, then up a ridge line, back through Forest Service land, across a creek, and so on for approximately one hour. At different times during the chase, the driver stopped and the officer drove near him only to see the driver speed away as the officer tried to

communicate with him. According to the officer, the only attempt by the driver to communicate was when "he showed me his middle finger." During one of these occasions, Officer Thompson approached him, called him by name and told him that by not stopping he was making it worse. During these events Officer Thompson noticed that the snowmobile had black and red tape over the markings on it. He also testified that he specifically looked for and observed that the snowmobile did not have displayed the required plate or sticker for an off highway vehicle ("OHV").

Officer Thompson testified that the defendant drove through an area that was marked with signs as closed to snowmobile operation. The closure is also indicated on maps that are distributed to the public. Officer Thompson also testified that he had specifically told the defendant in April 2003, in or near the area, that the location was closed to snowmobile use.

**B. Identification of the Driver**

Officer Thompson testified that at a key point during one of the stops, he was approximately ten feet from the driver. He saw the driver briefly remove his goggles and wipe his face. Officer Thompson testified that this took approximately ten seconds and during this time he had a clear view of the defendant's face. Whether Officer Thompson saw the driver's face is the key fact in dispute in this trial. The other witness, Mulligan, testified that he did not, at any time, see the driver of the snowmobiler remove his goggles.

Charlie Mulligan, a volunteer participant in a "ride along" program, was with Officer Thompson when they first encountered the snowmobiler. Mulligan and Thompson were each riding their own snowmobiles. Mulligan lives in and operates a business in South Lake Tahoe. He testified that he knows Officer Thompson on a personal basis and has seen the defendant around town but does not know him personally.

According to Mulligan, he and Officer Thompson had been outside a fenced area for about five minutes and were about to ride out when the snowmobiler went past them. Officer Thompson followed the snowmobiler and soon thereafter the chase ensued. Mulligan followed

but was some distance behind. He was able to see them throughout most, but not all, of the chase. There were periods of time that he could not see either the driver or the officer. Initially, they had traveled out of his view. When he reached the top of a hill he could see into a valley where the other two were riding during part of the chase. He saw them move through the trees and make occasional brief stops. During the portions of the pursuit that Mulligan observed, he saw that Officer Thompson was within four or five feet of the snowmobiler while they were moving and within fifteen to twenty feet of the snowmobiler when stopped.

At the time of the stop that pertains to the goggles, Mulligan was approximately fifty yards away, uphill and behind them. He saw they were stopped and Officer Thompson called for him. He rode down and turned his machine off. He observed that the driver and the officer were about twenty to thirty feet apart; their machines were turned off and he could hear the officer talking. Although he did not have the defendant in view the entire time, Mulligan did not see the driver remove his goggles nor did Mulligan at anytime see the driver's face. Moreover, Mulligan was unable to discern the driver's race, gender, or any other characteristic. He also did not notice curls of hair protruding below the helmet.

Mulligan saw Officer Thompson walk over to the snowmobiler and attempt to grab the key. The attempt failed and the driver started the machine and drove away. Officer Thompson followed his tracks to the west and off into the trees. Mulligan saw the snowmobiler in the trees, and observed him restart his machine and drive off.

Eventually Officer Thompson gave up the chase. He called for a sheriff's officer to meet him, and together they went to the defendant's home to wait for him. The defendant's home is approximately one-half mile from where officer Thompson first encountered the snowmobiler.[2] Officer Thompson testified that he believed defendant lived there because he had previously contacted him at this location. Officer Thompson found fresh snowmobile tracks leading from

---

[2] As discussed below, there is considerable confusion and conflicting evidence regarding the place of defendant's legal residence.

the edge of the driveway to the forest.

It is significant that although Mulligan did not see the driver remove the goggles, there were periods of time where he did not see the driver and Officer Thompson. He also conceded that the officer was closer to and had a better view of the driver. However, Mulligan stated that while it was possible that the goggles were removed during a period of time when he could not see the driver, Mulligan was of the opinion they were not stopped long enough for the driver to do so. Mulligan said that the snowmobiler and Officer Thompson were fairly close to each other and he, Mulligan, believes that if the driver had stopped long enough to take off the goggles there would have been enough time for the officer to remove the key or do what was necessary to apprehend the driver. Defendant relies heavily on this testimony in arguing that Officer Thompson did not actually see the driver's face. However, Mulligan's testimony on this point was not based on percipient knowledge, but was simply an expression of an opinion. More significantly, the basis for the opinion is both speculative and at odds with other facts established by the testimony of Mulligan and Officer Thompson.

Mulligan speculates that the rider was not out of his sight "long enough" to take off the goggles because the driver would have had to stop and take his arms off the handle bars long enough to raise the goggles. He therefore opined that if they were stopped long enough to do that, Officer Thompson would have been able to reach in and remove the key and take the rider into custody. This opinion necessarily makes a number of assumptions as to the ease with which an officer would be able stop and apprehend a driver under these circumstances. These assumptions do not take into account the need to limit force to that appropriate for a traffic infraction. The speculation that the goggles probably could not have been raised during the time they were stopped also disregards the fact that both he and the officer testified that Officer Thompson had, in fact, dismounted his vehicle. Indeed, each testified that Officer Thompson was on foot walking over to the other snowmobile, and that he had actually reached toward the driver's key in an attempt to remove it before the driver started his machine and sped away. The

6

assumption that the driver was not stopped long enough to simply raise his goggles for ten seconds also fails to account for the fact that Mulligan, in response the Officer Thompson calling him down, rode from the top of the hill toward where the other two snowmobiles were stopped.

In fairness to Mulligan, he lacks law enforcement training or experience in making stops. He also lacks expertise in the level of force appropriate, or inappropriate, to use in making stops for traffic infractions. Thus, for all of these reasons, Mulligan's opinion testimony, which is both speculative and counter to the factual observations described by both Mulligan and Officer Thompson, does not raise reasonable doubt as to the veracity of Officer Thompson's sworn testimony that he saw the driver briefly remove his goggles and had a clear view of defendant's face.

The court is mindful of the fact that Officer Thompson's report, written near the time of the events in question, states that the defendant took off his goggles a few times. On direct, Officer Thompson testified that the goggles were only removed once. He was confronted with the inconsistency on cross-examination and testified that it was only once and that the reference to a "few" times was an error. He reiterated on cross that he called the defendant by name and told him to head back down to his house and that he was making it worse for himself by not stopping. Officer Thompson was resolute and confident that during the brief period in question he had a clear view of the defendant's face. Although any inaccuracy in a report is always disconcerting, the inaccuracy raised here, even when corrected, does not contradict the relevant fact in question. Both the report and Officer Thompson's testimony at trial state that he briefly, but clearly saw the defendant's face. He also saw the defendant drive his snowmobile into an area that was signed and marked on maps as closed to snowmobile use. In view of the officer's overall demeanor and manner of testifying, the court finds his testimony credible. For these reasons, the court finds that the defendant was the individual driving the snowmobile during the incident in question.

////

## III. DISCUSSION

### A. Mens Rea Requirement

As a preliminary matter, the court addresses the issue of whether counts three, four and six require proof of *mens rea* on the part of defendant. This issue presented itself mid-trial, and the parties addressed it in post-trial briefing.[3] The Government asserts that each offense listed in counts three through nine should be characterized as "public welfare offenses" that contain no *mens rea* requirement. *See United States v. Morissette*, 342 U.S. 246, 256 (1952) (violation of certain regulations may be regarded as offenses against the United States' authority not requiring intent as an element). The defense argues that the alleged violations of 36 C.F.R. §§ 261.56, and 261.15(h) and (i), in counts three, four and six, are not strict liability offenses and require a showing of intent on defendant's part. Based on defendant's briefing, the court only addresses the *mens rea* issue as to these regulations, and not those listed in counts five, seven, eight or nine.

Neither party, nor the court, has found any dispositive case law regarding these particular sections and the issue of intent. The defense cites two Ninth Circuit cases that imply a *mens rea* requirement into violations of Forest Service regulations and statutes. In *United States v. Semenza*, 835 F.2d 223 (9th Cir. 1987), the Court held that a Forest Service Regulation, 36 C.F.R. § 261.7(a), contained an implied *mens rea* element of willfulness. That regulation prohibited "allowing unauthorized livestock to enter or be in the National Forest System." The Court reasoned that the term "allowing" implied a mental element, a "permission," and required the government to prove that the violator willfully allowed or willfully failed to prevent the cattle from entering the forest. *Id*., at 225. The holding in *Semenza* was based, in part, on the Court's decision in *United States v. Launder*, 743 F.2d 686 (9th Cir. 1984). In *Launder*, the Court found an implied *mens rea* element in a statute imposing liability on an individual who

---

[3] The court notes that the prosecution failed to file a trial brief, and that this issue was not presented in the defense's trial brief.

8

"permits or suffers [a] fire to burn or spread beyond his control" on federal lands. *Id.*, at 689. The Court reasoned that the "legal terms 'permitting' and 'suffering' clearly require[d] a willful act or a willful failure to act in the face of a clear opportunity to do so." *Id.*

These decisions were distinguished in *United States v. Kent*, 945 F.2d 1441 (9th Cir. 1990). In *Kent*, the Court found no *mens rea* requirement in a Forest Service regulation prohibiting use of Forest Service lands for residential purposes without authorization (i.e., 36 C.F.R. § 261.10(b)).[4] The court held that this regulation, unlike the regulations at issue in *Semenza* and *Launder*, contained no language implying a requisite state of mind. The court reasoned that "the language of section 261.10(b) speaks solely of action, with no reference to volition." *Id.*, at 1446. The court further commented that "the harshness of imposing strict liability here is mitigated by the fact that this regulation conforms to the description of a 'public welfare offense' as described in *Morissette v. United States*, 342 U.S. 246, 253-257, 96 L. Ed. 288, 72 S. Ct. 240 (1951), for which the Court deemed it appropriate that the crime 'depend on no mental element but consist only of forbidden acts or omissions.'" *Id.*, at 1446, n.9.

Here, the undersigned finds the regulations at issue in this case, particularly 36 C.F.R. §§ 261.56 and 261.15(i),(h), to be more akin to the regulation at issue in *Kent*. Section 261.56 provides, "[w]hen provided by an order, it is prohibited to possess or use a vehicle off National Forest System roads."

Similarly, section 261.15(i) provides, "[i]t is prohibited to operate any vehicle off National Forest System, State or County roads . . . in violation of State law established for vehicles used off roads." Subsection (h) provides that "[i]t is prohibited to operate any vehicle off National Forest System, State or County roads . . . in a manner which damages or unreasonably disturbs the land, wildlife, or vegetative resources."

---

[4] Section 261.10(b) provides that "[t]aking possession of, occupying, or otherwise using National Forest System lands for residential purposes without a special-use authorization, or as otherwise authorized by Federal law or regulation" is prohibited.

9

None of these regulations contain volitional language – such as "allow," "permit," or "suffer" – that could be construed as requiring intent on the part of defendant. Rather, these regulations speak of possession, use and operation. Like the regulation at issue in *Kent*, this language speaks "solely of action, with no reference to volition." Accordingly, the court concludes that counts three, four and six do not contain a *mens rea* requirement.

In any event, as discussed in the next section, the court finds that sufficient evidence was presented to establish that, with regard to counts three and six, defendant intentionally operated his snowmobile on closed Forest Service lands.[5]

### B. Counts One, Two, Three, and Six

As discussed above, the court finds that the defendant was the individual driving the snowmobile during the incident in question, and that the defendant led Officer Thompson on an extended chase, refusing to comply with repeated orders to stop. Although the officer began following the defendant before he entered onto National Forest System lands, the United States has "regulatory control over the defendant's conduct" while on non-federal land where the exercise of that control is "reasonably necessary to protect adjacent federal property." *United States v. Arbo*, 691 F.2d 862, 865 (9th Cir. 1982). Here, the officer had prior contacts with the defendant arising from his unlawful operation of a snowmobile on National Forest System lands, including issuance of a citation in 2003 in the same area. He had also on prior occasions seen snowmobile tracks in the area that had been closed to snowmobile use to protect wildlife and natural resources in the closed area. In the course of his official duties to patrol the area and protect Forest Service lands and resources, it was reasonably necessary for the officer to follow the defendant on his snowmobile when he passed by to determine whether the defendant would enter the closed area. In fact, the defendant did.

////

---

[5] Also discussed below, the court finds defendant not guilty of count four.

The court further finds that during the course of this pursuit the defendant refused repeated orders to stop, and on occasions when he was approached by the officer, he sped away. The orders to stop were objectively clear. Likewise, the refusal to comply was objectively clear, with the defendant, at one point, defiantly displaying his middle finger. Refusing the orders to stop and leading the officer on an extended chase interfered with the officer's performance of his duties in violation of 36 C.F.R. § 261.3(a) (count one), and 36 C.F.R. § 261.10(m) (count two).

The court finds that the defendant entered and drove his snowmobile across Forest Service lands that were designated with signs and on maps provided to the public as closed to snowmobile use. By violating the closure order, the defendant operated a vehicle off road in a manner that violates a Forest Service order, in violation of 36 C.F.R. § 261.56 (count three) and 36 C.F.R. § 261.15(i) and Cal. Veh. Code § 38301 (count six).

Accordingly, the court finds the defendant guilty of counts one, two, three, and six of the information.

### C. Count Four

Count four charges the defendant with operating his OHV in a manner that "damages or unreasonably disturbs the land, wildlife, and vegetative resources" in violation of 36 C.F.R. § 261.15(h). No evidence was presented that the defendant's snowmobile damaged any vegetation, soil, or wildlife. Indeed, there was no evidence that the defendant's operation of the snowmobile damaged anything. Neither was there evidence that any particular species of wildlife (plant or animal) was actually disturbed by the entry of the snowmobile into the closed area. More importantly, there was no evidence presented that such an entry, generally, results in the disturbance to a specific species in some particular manner, such that an inference could be drawn that there was unreasonable disturbance or damage caused in this instance. Rather, the government argues that "because the area was specifically closed to motor vehicles in order to prevent the destruction of native wildlife, *any* entry into the area by a motorized vehicle would unreasonably disturb the 'land, wildlife, and vegetative resources.'" Government's Post-Trial

11

Brief, at 5:4-8 (emphasis in original).  The argument seeks more than the language of the regulation can support.  There is no language in the regulation to suggest that any entry into the closed area is a per se violation of section 261.15(h) regardless of disturbance or damage. Without some evidence by which the court can infer unreasonable disturbance or damage, the court cannot simply assume it.

The words "unreasonably disturb" cannot be read out of the regulation.   These words have meaning and cannot be ignored.  It may well be that some plants or animals being protected by the closure of an area are nearly always, or even generally, disturbed or damaged by a motor vehicle.  It is entirely possible that the scientific literature includes studies which have shown that particular protected plants and animals are unreasonably disturbed by the mere proximity of a motor vehicle.  Indeed, it is possible that the mere sound of a nearby motorized vehicle unreasonably disturbs hibernating species known to be in the protected area and that this form of disturbance has been demonstrated by particular studies.  If that is the case, the evidence, either from the studies or expert testimony, to establish that fact should be presented.  If these or similar reasons form the basis for a charge under this regulation, the evidence to support those facts could and should be produced to support the inference that in this case the defendant's entry into the area caused unreasonable disturbance to the land, wildlife, or vegetative resource.

The government quite properly points out that unlike 36 C.F.R. § 261.56, which prohibits entry into an area closed by a Forest Service order, section 261.15(h) applies anywhere in the National Forest where the use of the vehicle causes unreasonable disturbance or damage.  In that sense, the regulation as interpreted by the prosecution is not duplicative of section 261.56.  The point is taken.  But it begs the question of whether there must be some evidence of disturbance or damage.  Here, there was none and the regulation requires it.

For these reasons, defendant is found not guilty of count four.

**D.  Count Five**

Count five charges the defendant with failing to register his off road vehicle in violation

of Cal. Veh. Code § 38020.[6]  The evidence was conflicting as to whether defendant qualified for a non-resident sticker to satisfy this requirement, or alternatively, whether defendant's vehicle was validly registered in another state.

Officer Thompson testified that he knew from prior contacts with defendant at his residence that the defendant lives in South Lake Tahoe, California.  Officer Thompson also testified that he had prior occasion to determine whether defendant's snowmobile was registered.  This included a prior contact with the defendant in the winter of 2005-2006 when Officer Thompson determined that the defendant did not have a California registration.  It also included a prior contact when he cited the defendant in 2003 for reasons unrelated to the registration.  During the latter contact the defendant possessed an Oregon license and a nonresident sticker.  The defendant was not cited for registration violations on these prior occasions.

The basis for defendant's lawful operation of his snowmobile in California was inconsistent, but apparently presented in the alternative.  One theory suggested by the defense is that the defendant had a nonresident sticker issued by California.  Another theory suggested that the defendant's OHV was registered in the state of Oregon which would satisfy the California Vehicle Code.  The court addresses each theory.

The California Vehicle Code requirements and exceptions for the registration of OHVs is byzantine and difficult to navigate.  Section 38020 prohibits operation of a vehicle that is not registered in compliance with the provisions of Division 3, commencing at section 4000.  Section 4000(a) prohibits use of any motor vehicle unless it is registered in California in accordance with the code.  However, it excepts "an off-highway motor vehicle which *displays* an identification plate or device issued by the department [of motor vehicles] pursuant to Section

---

[6] *See* 16 U.S.C. § 551 and 36 C.F.R. § 261.15(I)

38010." Cal. Veh. Code § 4000(a)(1).[7] Section 38010(a) requires all motor vehicles (including snowmobiles, *see* section 38012(b)(2)) not registered under the code because they are to be operated exclusively off highway to have clearly displayed "an identification or plate or device issued by the department." Subsection (b) states that the requirement of subsection (a) "does not apply to any of the following:

> . . . . (6) A motor vehicle with a currently valid special permit issued under Section 38087.5 that is owned or operated by a *nonresident* of this state and the vehicle is *not identified or registered in a foreign jurisdiction.* For purposes of this paragraph, a person who holds a valid driver's license issued by a foreign jurisdiction is presumed to be a nonresident [ [8] ] . . . .
>
> (10) A motor vehicle with a currently valid identification or registration permit issued by another state."

Cal. Veh. Code § 38010(b)(6) and (10) (emphasis and footnote added).

Thus, a vehicle operated in California must be registered in California, or it must be a vehicle operated by a nonresident exclusively off highway and have a California issued OHV permit. Cal. Veh. Code § 38010(b)(6).[9] Alternatively, the vehicle must have a valid registration or permit issued by another state. Cal. Veh. Code § 38010(b)(10).

The exemption under sections 38010(b)(6) requires a valid nonresident permit issued by either the Department of Motor Vehicles or the Department of Parks and Recreation pursuant to

---

[7] Subdivision (a) does not apply to OHVs operated pursuant to sections 38025 and 38026.5, which authorize limited highway operation of an OHV if that OHV has an identification plate or device pursuant to section 38160.

[8] A similar presumption is created by possession of a California driver's license. "For purposes of this section [§ 4000], possession of a California driver's license by the registered owner of a vehicle shall give rise to a rebuttable presumption that the owner is a resident of California." Cal. Veh. Code. § 4000(g). Evidence was not introduced as to whether the defendant has a driver's license and if so, from what state. Therefore, the rebuttable presumption under the vehicle code is of no assistance. The other evidence on the question is in conflict.

[9] This section specifically exempts from the normal registration requirements OHVs having a valid nonresident permit issued by the Department of Parks and Recreation pursuant to section 38087.5. As discussed below, the defense presented Exhibit B which is such a permit for the year 2006, and the testimony of Mr. Brown that he sold the defendant such a permit.

14

1  section 38087.5. The exemption under section 38010(b)(10) requires the vehicle to have a
2  currently valid registration or permit issued by another state. The defendant appears to claim
3  that he qualifies under either or both provisions. He presented Exhibit B which is a nonresident
4  sticker issued by the Department of Parks and Recreation for the year 2006. The defense also
5  presented the testimony of Glenn Brown, who said he sold the defendant a nonresident OHV
6  sticker for 2006. Mr. Brown sold such stickers to the defendant in previous years and has seen
7  the defendant riding his snowmobile in the Hope Valley snow park on many occasions. Mr.
8  Brown operates a photography business at the snow park, and as a courtesy, sells nonresident
9  OHV stickers.[10] The inference, then, is that the defendant, if he is not a California resident,
10 meets the requirements of section 38010(b)(6). However, the defense also presented a record
11 from the state of Oregon indicating some unexplained registration in the defendant's name
12 showing a Nevada address. The inference from this evidence is that the defendant is a
13 nonresident (from Nevada) with a registration issued by another state (Oregon) and therefore
14 meets the requirements of section 38010(b)(10).

15      It is not at all clear that defendant qualifies for a nonresident sticker for purposes of
16 subsection (b)(6) or as a nonresident for purposes of subsection (b)(10). The evidence was
17 conflicting and incomplete as to the defendant's residency. Officer Thompson credibly testified
18 that he had prior contacts with the defendant at the house located in South Lake Tahoe,
19 California and understood that defendant resides there. This included a conversation with the
20 defendant in 2002 during which the defendant told Officer Thompson that he lived at the South
21 Lake Tahoe house. Moreover, the notice to appear was sent to the defendant at the South Lake
22 Tahoe, California address and the defendant responded to that notice. The defendant obviously
23 lives in the area as other witnesses testified to seeing him frequently in the general area.
24 ////

---

[10] However, he does not verify the place of residency of the purchaser beyond accepting whatever representation is made at the time of the purchase.

15

However, the defense produced evidence (Exhibit E) depicting some sort of registration with the Oregon Department of Motor Vehicle Services. That document is dated December 21, 2006, and it shows the defendant's address as Stateline, Nevada.

Assuming that the defendant is not a resident of California, the exception provided under section 38010(b)(6) is inapplicable because, by its terms, it only applies to a vehicle that "is not identified or registered in a foreign jurisdiction." The defendant's own evidence, Exhibit E, was offered to show that the vehicle was registered in Oregon, which renders subsection (b)(6) inapplicable.

The fact that defendant had obtained a nonresident OHV sticker for 2006, apparently in compliance with this subsection, undermines his argument that the snowmobile is registered in Oregon. Indeed, defendant's Exhibit E is far from conclusive regarding *which* vehicle is in fact registered in Oregon.

This lack of clarity translates into similar problems in determining the applicability of the exemption set forth in subsection (b)(10). Under that subsection, a motor vehicle with a currently valid identification or registration permit issued by another state, is exempted from obtaining and displaying an identification plate or device issued by the department of motor vehicles. Again, defendant presented Exhibit E at trial showing registration of some vehicle in Oregon for the period in question.

Thus, the "failure to register" charge in count five reduces to the question of whether defendant had a current valid registration permit issued by another state for his vehicle. Neither side has satisfactorily addressed the issue, but it is the government that bears the burden of proof.

Whether the defendant is a resident of California or Nevada, and more importantly, whether Oregon law authorizes the registration in Oregon of a vehicle owned by a nonresident of that state are questions that the government has not answered. The defendant has presented some evidence (Exhibit E) that he had a current valid registration issued by the state of Oregon.

////

16

1  Although the face of the exhibit leaves many unanswered questions and was not otherwise
2  explained at trial, it raises reasonable doubt as to this charge.  Moreover, it is not the defendant's
3  burden to prove his innocence.   Accordingly, the defendant is found not guilty as to count five.

### E.  Counts Seven, Eight, and Nine

Counts seven, eight and nine all involve the absence of any registration sticker, plate or other device on the defendant's snowmobile.  Count seven charges the failure to display a registration identification on an off road vehicle in violation of Cal. Veh. Code § 38170(a). Count eight charges the failure to securely fasten an identification plate in a position to be clearly visible on an off road vehicle in violation of § 38170(b).  Count nine charges the failure to securely fasten identification plates on the left rear quadrant of an off road vehicle in violation of § 38170 (c).

There is no doubt that the defendant's vehicle failed to have any sticker, plate or other device displayed during the time of the chase.  Officer Thompson credibly testified that he looked for and saw no OHV sticker or plate displayed anywhere on the defendant's snowmobile, and in particular, anywhere on the rear of that snowmobile.

Nonetheless, the government has failed to address the convergence of  Cal. Veh. Code § 38010(b)(10) and section 38170(a)-(c).  In particular, the display requirements set forth in section 38170 apply only to "off-highway motor vehicle[s] subject to identification."  Cal. Veh. Code § 38170(a).  Section 38012 provides that "'off-highway motor vehicle[s] subject to identification' means a motor vehicle subject to the provisions of subdivision (a) of Section 38010."  Cal. Veh. Code § 38012(a).

Again, subsection 38010(a) requires all motor vehicles (including snowmobiles, *see* section 38012(b)(2)) not registered under the code because they are to be operated exclusively off highway to have clearly displayed "an identification or plate or device issued by the department."  However, as discussed above, section 38010(a) does not apply to vehicles "with a currently valid identification or registration permit issued by another state."  Cal. Veh. Code

§ 38010(b)(10).  The court has concluded that, given the evidence tending to show that defendant qualifies under this exemption, the government has not carried its burden in proving beyond a reasonable doubt that defendant failed to register his snowmobile.  Absent proof to the contrary, the court must conclude that defendant's snowmobile was not "subject to identification" and therefore not subject to the requirements set forth in sections 38170(a)-(c).[11]  Accordingly, the court finds defendant not guilty on counts seven, eight, and nine.

## IV.    CONCLUSION AND ORDER

In accordance with the foregoing, the defendant is found not guilty of counts four, five, seven, eight, and nine; and guilty of counts one, two, three, and six.

The matter is referred to the United States Probation Office for preparation of a presentence report.   The matter is set for judgment and sentencing on September 10, 2007 at 10:00 a.m. in Courtroom No. 25.

IT IS SO ORDERED.

Dated:  June 29, 2007

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[11]  Although this reading of the vehicle code seems to create the somewhat unusual result of allowing all off-road vehicles validly registered in other states to be driven without displaying any identification plates or devices, the court will not read requirements into the code where there are none, especially when the government has presented no evidence or briefing on this issue.